Amanda PRETTYMAN, Plaintiff,

v.

Lillie Mae GOODWIN,
et al., Defendants.

No. Civ.A. 99–T–1240–E.

United States District Court,
M.D. Alabama,
Eastern Division.

Aug. 31, 2000.

Edward F. Berry, Jennifer E. Cobb, Berry & Shelnutt, P.C., Columbus, GA, for Amanda Prettyman, plaintiff.

John M. Britton, Ferrell & Britton, Phenix City, AL, for Lillie Mae Goodwin, defendant.

Charles F. Carr, Caroline T. Pryor, Carr, Allison, Pugh, Howard, Oliver & Sisson, PC, Daphne, AL, Thomas L. Oliver, II, Carr, Allison, Pugh, Howard, Oliver & Sisson, PC, Birmingham, AL, for Wal-Mart Associates, Inc., Wal-Mart Stores East, Inc., Wal-Mart Stores, Inc., defendants.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

Plaintiff Amanda Prettyman filed this lawsuit against defendants Lillie Mae Goodwin, Wal-Mart Stores, Inc., Wal-Mart Stores East, Inc., and Wal-Mart Associates, Inc. Removal jurisdiction is appropriate based on diversity of citizenship, 28 U.S.C.A. §§ 1332, 1441. Prettyman asserts the following claims: negligence against the Wal-Mart defendants and Goodwin, and concomitant liabilities for loss of use or enjoyment of property, bodily injury, and loss of wages.

Currently before the court is the Wal-Mart defendants' motions for summary judgment. For the reasons that follow, the motions will be granted.

## I. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115–17 (11th Cir.1993) (describing the responsibilities of the summary judgment movant and nonmovant as dependent upon the locus of the burden of proof at trial). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## II. BACKGROUND

Viewed in the light most favorable to Prettyman, the facts are as follows. On October 31, 1998, Prettyman was proceeding northbound in a Wal-Mart Super Center's parking lot located in Phenix City, Alabama. As she reached an intersection in the parking lot—one that did not contain any stop signs, stop lines, or other traffic control markings designating the right-of-way—Prettyman slowed down, stopped, and then entered the intersection. Goodwin's vehicle, which was traveling westbound in the parking lot, collided with Prettyman's vehicle in the intersection, striking the right front passenger door and rear quarter panel of Prettyman's vehicle. Prettyman alleges that she suffered bodily injury and severe damage to her vehicle.

## III. DISCUSSION

In its summary-judgment brief, the Wal-Mart defendants argue that they owed no duty to Prettyman, and are thus not liable for negligence. Prettyman argues to the contrary. Alabama law recognizes that "before liability for negligence can be imposed, there must first be a legal duty owed to the person injured or to a class of persons to which the plaintiff belongs, and a breach of that duty, proximately resulting in the injury." *Graveman v. Wind Drift Owners' Association, Inc.,* 607 So.2d 199, 203 (Ala.1992) (citations omitted). The existence of a duty is fundamental to a negligence claim, and the duty may derive from statutory law or the common law. *See id.* The court will con-

sider the parties' arguments as to statutory and common-law duties in turn.

### A. Statutory Duty

The parties dispute the question of whether state statutes encumber the Wal–Mart defendants with a statutory duty of care. Prettyman asserts that the Wal–Mart defendants were required by state law to install appropriate traffic-control devices at the parking lot intersection. This duty, she claims, is mandated by the following provision:

"Quasi-public traffic and parking areas.

\*    \*    \*    \*    \*    \*

[W]hen the owner of real property allows said real property to be used by the public for the purpose of vehicular travel, and/or as a quasi-public parking lot for the use of customers, tenants or employees of said property, the owner of said real property shall erect and maintain all traffic-control devices thereon in strict accordance with the rules and regulations in effect in the local jurisdiction and in conformance with the Alabama Manual on Uniform Traffic–Control Devices and any revisions thereof."

1975 Ala.Code § 32–5–2.

Facially, § 32–5–2 is ambiguous. It might reasonably be read as requiring the erection of traffic-control devices when the Alabama Manual on Uniform Traffic–Control Devices ("AMUTCD") or relevant local rules so provide.[1] But the provision might just as plausibly be construed as merely imposing a conditional duty regulating the *manner* in which owners of quasi-public parking areas erect and maintain traffic-control devices should such owners in their discretion elect to have traffic-control devices.[2]

This textual ambiguity in § 32–5–2 may be resolved by placing the provision in its statutory and caselaw context. In *Davis v. Coffee County Commission*, 505 So.2d 329 (Ala.1987), the Alabama Supreme Court determined that local governmental jurisdictions act at their discretion when they decide whether or not the erection of a traffic-control device is necessary. Reviewing Alabama case law, common-law history, and the provisions of the 1975 Code, particularly § 11–47–190, the *Davis* court found no basis for a governmental duty to provide traffic-control devices, but rather merely a conditional duty to maintain any traffic-control devices that have been put in place. *See id.* at 329. Similarly, an opinion issued by the Alabama Attorney General interprets the mandate of the AMUTCD not in terms of an affirmative requirement to institute traffic control devices but as a regulation of the manner of their implementation, that is, that "[a]ll traffic control devices in the State of Alabama shall be in conformance with this manual." 228 Ala.Op.Atty.Gen. 42, 1992 WL 535511 (Ala.A.G.).

■ Given this clear rule that local governments have no duty to institute traffic-control devices, it would be anomalous to construe § 32–5–2 and AMUTCD (laws and regulations created primarily with governments in mind) as creating an affirmative duty for private entities like the Wal–Mart defendants. If, in § 32–5–2, the legislature had intended to create such an affirmative duty for private owners of quasi-public parking lots, it likely would have done so quite unambiguously, knowing as it would that such a duty cut against a long-standing background principle of no affirmative governmental duties.

Finally, even if, for the sake of argument, the court were to try to read § 32–5–2 as creating an affirmative duty that

---

**1.** The AMUTCD provisions that Prettyman contends apply here are attached as an appendix to this opinion.

**2.** The paragraph following the quoted language of § 32–5–2 continues as follows:

"Nothing herein contained, however, shall be construed to compel the state or local governmental jurisdiction to maintain such quasi-public parking areas and lots or to install or maintain any traffic-control device therein or thereon."

This proviso denying the imposition of a duty on the government, however, bears no clear implications for the duty of a private owner of a quasi-public parking area.

the Wal–Mart defendants erect traffic-control devices in accordance with the AMUTCD and local rules and regulations, the court would be left without any guidance as to the appropriate content of that duty. The court can find no mandatory language in the AMUTCD that clearly speaks to the choice to erect traffic-control devices rather than just to the manner of any such erection. Nor has Prettyman cited any local rules and regulations for such language. If the AMUTCD or local laws provide any coherent basis for defining an affirmative duty to erect traffic-signals, Pretttyman has failed to provide such evidence to the court.[3]

### B. Common–Law Duty

■ The Wal–Mart defendants argue they owed no common-law duty to Prettyman because the intersection was an open and obvious danger. It is not disputed that Prettyman was a business invitee of the Wal–Mart defendants and that Alabama law holds that, as a general rule, "an invitor will not be liable for injuries to an invitee resulting from a danger which was known to the invitee or should have been observed by the invitee in the exercise of reasonable care." *Harding v. Pierce Hardy Real Estate*, 628 So.2d 461, 463 (Ala. 1993) (citations omitted). The *Harding* Court described the rule as follows:

"The duty to keep premises safe for invitees applies only to defects or conditions which are in the nature of hidden dangers, traps, snares, pitfalls, and the like, in that they are not known to the invitee, and would not be observed by him in the exercise of ordinary care. The invitee assumes all normal or ordinary risks attendant upon the use of the premises, and the owner or occupant is under no duty to reconstruct or alter the premises so as to obviate known and obvious dangers, nor is he liable for injury to an invitee resulting from a danger which was obvious or should have been observed in the exercise of reasonable care.... The entire basis of an invitor's liability rests upon his supe-

rior knowledge of the danger which causes the invitee's injuries."

*Id.* (citations omitted).

The Wal–Mart defendants argue that Prettyman should have been aware of the open and obvious danger in the parking lot, particularly because she had been in the lot on previous occasions. Prettyman, citing *Harris v. Flagstar Enterprises, Inc.*, 685 So.2d 760 (Ala.Civ.App.1996), argues that whether a danger is open and obvious and whether a person fails to exercise reasonable care in noting the danger are issues appropriately decided by a jury.

In *Harris*, the court noted that " 'questions of openness and obviousness of a defect or danger and of the plaintiff's knowledge are *generally* not to be resolved on a motion for summary judgment.' " *Id.* at 762 (quoting *Harvell v. Johnson*, 598 So.2d 881, 883 (Ala.1992)) (emphasis added). The *Harris* court reversed a summary judgment for the defendant because there existed a dispute as to whether the plaintiff could have known that offending substances, specifically some sand and cigarette butts that allegedly caused her fall, rested in a parking lot.

However, *Harvell*, the case cited for the general proposition that a jury should determine questions of openness, upheld summary judgment for the defendant because the undisputed facts demonstrated that the plaintiff was aware of the danger on the defendant's property that caused his injury, appreciated the danger, and acted more carefully because of the perceived danger. 598 So.2d at 883. Likewise, in another case that relies upon *Harvell*, the Alabama Supreme Court stated that the issue of the openness and obviousness of a danger may be decided on summary judgment if the underlying facts are undisputed. *See Harding v. Pierce Hardy Real Estate*, 628 So.2d 461, 463 (Ala.1993).

■ In this case, the facts are undisputed. Prettyman was aware of and appreciated the danger at the unregulated inter-

---

**3.** *See supra* note 1 and the appendix to this opinion.

section. In light of her testimony that she came to a full stop before entering the intersection, Prettyman presumably acted more carefully due to the perceived danger at the parking lot's intersection. The danger at Wal–Mart's intersection was not hidden, and thus the Wal–Mart defendants did not owe a duty to Prettyman to warn her of the danger.

## IV. CONCLUSION

In light of the foregoing reasons, the Wal–Mart defendants' motions for summary judgment will be granted. An appropriate judgment will be entered. This case will, however, proceed to trial on Prettyman's claims against Goodwin.

## SECTION B

## STANDARD REGULATORY SIGNS

### B–1 GENERAL

#### B–1.01 APPLICATION OF REGULATORY SIGNS

Regulatory signs shall be used to inform a vehicle operator of traffic laws or regulations and to indicate the applicability of legal requirements that would not otherwise be apparent. These signs should be erected wherever needed to fulfill this purpose, but unnecessary regulations should be avoided. Signs that have been erected previously but are no longer applicable shall be removed.

Some regulatory signs are related to operational controls but do not impose any obligations or prohibitions. For example, signs giving advance notice of or marking the end of a restricted zone are included in the regulatory group.

Regulatory signs shall be erected at those locations where regulations apply. The sign message shall clearly indicate the requirements imposed by the regulation and shall be easily visible and legible to the vehicle operator.

#### B–1.02 DESIGN OF REGULATORY SIGNS

Generally, regulatory signs are rectangular in shape with the larger dimension vertical, and have black lettering and border on a white background. However, there are exceptions to this rule as noted in this section of the Manual.

The sign dimensions prescribed in this Manual indicate the standard size for use on highways of the State Highway System and on important county roads and urban arterial streets. Larger sizes are prescribed for use on Interstate Highways and on other highways which are constructed to full control of access standards. Where conditions require greater visibility or emphasis, signs larger than standard may be used, with the legend enlarged approximately in proportion to the outer dimensions. On minor roads and secondary streets which are not a part of the State Highway System, signs smaller than the standard size may be used. Variations in size dimensions should be in multiples of six inches.

All regulatory signs, unless otherwise noted in this Manual, shall be reflectorized.

Letters and numbers shown enclosed in parenthesis in this Manual when referring to or describing signs are variable. Details of signs and symbols shown in this Manual are available from the State Traffic Engineer.

#### B–1.03 LOCATION OF REGULATORY SIGNS

Regulatory signs shall be erected in accordance with the general requirements for sign placement as given in Section A of this Manual.

Temporary regulatory signs indicating rules or regulations that are temporary should be mounted on portable standards or in some manner so they can be set up and removed as required.

### B–2 RIGHT–OF–WAY SERIES

These signs should be erected at the point where vehicle operators may be required to stop or yield or as near thereto as possible. In no case shall these signs be placed further than 50 feet from the near

edge of the intersected roadway. Where there is a marked crosswalk, the normal location of these signs should be approximately five feet in advance of that crosswalk line, nearest to approaching traffic (see *Figure B–1* ).

Where only one STOP or YIELD sign is used on a particular intersection approach, the approximate location shall be on the right side of the roadway for vehicle operators approaching the intersection. At an intersection where the approach is very wide, observance of the sign may be improved by the erection of an additional sign on the traffic island on the left side of the approach roadway. At channelized intersections, the sign may be effectively placed on the channelizing island. STOP or YIELD signs shall not be placed on the far side of an intersection, nor should they be used on the through roadways of expressways.

**SIGN R1-1**

Standard Size
30" x 30"

The R1-1, STOP, sign shall be used on approaches of intersections and at other locations where conditions warrant STOP sign control. The sign should be supplemented with a stop line on the pavement.

Where greater emphasis or visibility is required, a larger than standard size is recommended. On low-volume local streets and secondary roads with low approach speeds, a 24-inch by 24-inch size may be used.

ACUTE ANGLE INTERSECTION     CHANNELIZED INTERSECTION

MINOR CROSSROAD     URBAN INTERSECTION

DIVISIONAL ISLAND     WIDE THROAT INTERSECTION

NOTE: See subarticle A-5 04 for lateral clearance of signs.

**TYPICAL LOCATIONS OF STOP AND YIELD SIGNS**

## FIGURE B - 1

Secondary messages shall not be used on STOP sign faces. However, other signs such as the R1-3, R1-4, R6-1, R6-3, R6-3A, and D-3 signs may be installed on the same post with a STOP sign.

Normally, a STOP sign should be placed to stop traffic on the minor roadway. Traffic engineering studies, however, may justify a decision to install a STOP sign or signs on the major street, as at a three-way intersection where safety considerations may justify stopping the greater flow of traffic to permit a left turning movement.

Because the STOP sign causes a substantial inconvenience to motorists, it should be used only where warranted. A STOP sign may be warranted at an intersection where one or more of the following conditions exist:

1. Intersection of a less important highway, street, or road with a main highway, street, or road where application of the normal right-of-way rule is unduly hazardous.

2. Intersection of a county road or city street with a State highway.

3. Intersection of two main highways, roads, or streets where no traffic control signal is present.

4. Street, road, or highway entering a through highway, road, or street.

5. Unsignalized intersection in a signalized area.

6. Other highway, road, or street intersections where a combination of high speed, restricted view, and serious accident record indicates a need for control by a STOP sign.

7. STOP signs may be used at selected railroad-highway grade crossings only after their need has been determined by a detailed traffic engineering study. Use of the STOP sign at railroad-highway grade crossings is described in Section H, Volume 2.

Prior to the application of these warrants, consideration should be given to less restrictive measures, such as the YIELD sign, where a full stop is not necessary at all times. Periodic reviews of existing installations may be desirable to determine whether, because of changed conditions, the use of less restrictive control or no control could accommodate traffic demands safely and more effectively.

Properly designed expressway interchanges provide for the continuous flow of traffic, making STOP signs unnecessary even on the entering roadways. Where at-grade intersections are temporarily justified for local traffic in sparsely populated areas, STOP signs should be used on the entering roadways to protect the through traffic. STOP signs may also be required at the end of diverging roadways at the intersection with other highways not designed as expressways. In most of these cases, the speeds will not warrant any great increase in the sign sizes.

STOP signs shall not be erected at intersections where traffic control signals are operating. The conflicting commands of two types of control devices are confusing. If traffic is required to stop when the operation of the stop-and-go signals is not warranted, the signals should be put on flashing operation with the red flashing light facing the traffic that must stop.

Portable or part-time STOP signs shall not be used except for emergency purposes. Also, STOP signs should not be used for speed control.

**SIGN R1-2**

Standard Size
36" x 36" x 36"

The R1-2, YIELD, sign should be used to assign right-of-way to traffic on certain approaches to an intersection. Vehicles controlled by a YIELD sign need to stop only when necessary to avoid interference with other traffic that is given the right-of-way.

The YIELD sign may be warranted:

1. At the entrance to an intersection where it is necessary to assign right-of-way and where the safe approach

speed on the entrance exceeds ten mph.

2. On the entrance ramp to an expressway where an acceleration lane is not provided.

3. Within an intersection with a divided highway where a STOP sign is present at the entrance to the first roadway and further control is necessary at the entrance to the second roadway, and where the median width between the two roadways exceeds 30 feet.

4. Where there is a separate or channelized right turn lane without an adequate acceleration lane.

5. At any intersection where a special problem exists and where an engineering study indicates a problem to be susceptible to correction by use of the YIELD sign.

YIELD signs generally should not be placed to control the major flow of traffic at an intersection.

YIELD signs may be used on an entering roadway of an expressway without an adequate acceleration lane, but in a well-designed interchange, the sign would interfere with the free merging movement, and it should not be used under those circumstances.

**SIGN R1-3**

Standard Size
12" x 6"

**SIGN R1-4**

Standard Size
18" x 6"

**The R1-3, 4-WAY or R1-4, ALL WAY, sign should be installed with each STOP sign at intersections where the traffic volumes on the intersecting roadways are approximately equal and conditions warrant multiway STOP sign control.**

**At a multiway stop intersection, each STOP sign shall be supplemented by a separate 4-WAY or ALL WAY sign mounted just below it.**

**Any of the following conditions may warrant a multiway stop installation:**

1. Where traffic signals are warranted and urgently needed, the multiway stop is an interim measure that can be installed quickly to control traffic while arrangements are actually being made for the signal installation.

2. An accident problem as indicated by five or more reported accidents in a 12–month period of a type susceptible to correction by a multiway stop installation. Such accidents include left and right turn collisions as well as right-angle collisions.

3. Minimum traffic volumes:

a. The total vehicular volume entering the intersection from all approaches must average at least 500 vehicles per hour for any eight hours of an average day, and

b. A combined vehicular and pedestrian volume from the minor highway, road, or street must average at least 200 units per hour for the same eight hours, with an average delay to the minor street vehicular traffic of at least 30 seconds per vehicle during the maximum hour, but [missing page]

c. Where the 85–percentile approach speed of the major street traffic exceeds 40 mph, the minimum volumes required in (a) and (b) immediately above shall be 70 percent of those given.

## B–3 SPEED CONTROL SERIES

The signs in this Article display the established speed limits. In order to determine the proper numerical value for a speed zone on the basis of an engineering and traffic investigation, the following factors should be considered:

1. Road surface characteristics, shoulder condition, grade, alignment and sight distance.

2. The 85–percentile speed and pace speed.

3. Roadside development and culture, and roadside friction.

4. Safe speed for curves or hazardous locations within the zone.

5. Parking practices and pedestrian activity.

6. Respond accident experience for a recent 12–month period.

Speed control signs installed on Interstate Highways should be in pairs facing approaching traffic, one on the right side and the other on the left or median side. No more than three specific speed limits shall be posted at any one sign installation. If more than three specific speed limits apply and are to be posted on any particular section of highway, street or road, the additional limits shall be posted on a second sign installation approximately 100 feet beyond the first installation on conventional highways, roads and streets, and approximately 300 feet beyond the first sign installation on Interstate Highways, other highways which are constructed to full control of access standards, and major divided conventional highways.

Speed control signs shall be located at the points of change from one speed limit to another. At the end of a section to which the speed limit applies, a speed control sign showing the next speed limit shall be erected. Additional signs shall be installed beyond major intersections and at locations where it is necessary to remind vehicle operations of the limit that is applicable.

In school areas, the END SCHOOL ZONE sign may be used as an alternate to the speed control signs.

Speed limits shall be indicated in increments of five mph.

**SIGN R2-1**

Standard Size
24" x 30"

The R2-1, SPEED LIMIT (55), sign shall display the maximum speed established after a traffic engineering investigation has been made.

**SIGN R2-2A**

TRUCK SPEED LIMIT 40

Standard Size
24" x 36"

The R2-2A, TRUCK SPEED LIMIT (40), sign shall display the maximum speed for trucks. It may be used in combination with the R2-1 sign or singly as conditions require. It is never to be used with the R2-2B sign.

This sign shall be used to post the truck speed limit at every location where an R2-1, SPEED LIMIT, sign is erected within a section of highway, road, or street where the truck speed limit applies.

**SIGN R2-2B**

SPEED LIMIT 55 TRUCKS 45

Standard Size
24" x 48"

The R2-2B, SPEED LIMIT (55) TRUCKS (45), sign may be used to display the same message as a combination of R2-1 and R2-2A signs.

This is a single panel sign showing the maximum speed limit in the upper portion and the truck speed limit in the lower portion of the sign.

SIGN R2-4

Standard Size
24" x 30"

The R2-4, MINIMUM SPEED (45), sign may be used when an engineering and traffic investigation shows that slow speeds on a highway consistently impede the normal and reasonable movement of traffic. When used, this sign shall be used in combination with the R2-1, SPEED LIMIT, sign.

Driving slower than the posted minimum speed is illegal except when necessary for safe operation due to unusual circumstances or in compliance with another regulation. The R2-4A is preferred to the R2-4 sign when conditions are suitable.

SIGN R2-4A

Standard Size
24" x 48"

The R2-4A, SPEED LIMIT (55) MINIMUM (45), sign may be used to display the same message as a combination of R2-1 and R2-4 signs.

This is a single panel sign showing the maximum speed limit in the upper portion and the minimum speed limit in the lower portion of the sign.